PEARSON, J.

FILED

2011 SEP 30  PM 5: 06

U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
YOUNGSTOWN

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| BERTHA VILLANUEVA, | ) | CASE NO. 1:10CV01488 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE BENITA Y. PEARSON |
| v. | ) | |
| | ) | |
| MARCUS BARCROFT, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | **MEMORANDUM OF OPINION AND** |
| | ) | **ORDER** (Resolving ECF Nos. 21, 35, 42, and 56.) |

## I.  Introduction

Before the Court are four motions: Defendants' Martin York and M Y Investments'

(collectively hereafter "York") Motion to Dismiss for Lack of Personal Jurisdiction, Improper

Venue, or, Alternatively, to Transfer Venue, and to Dismiss for Failure to State a Claim (ECF

No. 21), Plaintiff Bertha Villanueva's ("Villanueva") Motion for Partial Summary Judgment

(ECF No. 35), York's Rule 56(f) Motion to Withhold Ruling on Bertha Villanueva's Motion for

Partial Summary Judgment (ECF No. 42), and Villanueva's Motion for Default Judgment against

Defendant Robert Marsh ("Marsh") (ECF No. 56).  For the reasons set forth below, the Court

grants York's Motion to Dismiss (ECF No. 21) without prejudice, having found that the forum

selection clause is applicable, binding and makes venue in the Northern District of Ohio

improper.  This ruling renders ruling on Villanueva's  Partial Motion for Summary Judgment

(ECF No. 35), York's Motion to Withhold Ruling (ECF No. 42) and Villanueva's Motion for

Default Judgment (ECF No. 56) unnecessary.  The Court, therefore, denies these motions without

prejudice.

(1:10CV01488)

## II.  **Procedural History**

On or about July 6, 2010, Villanueva filed this lawsuit in the United States District Court for the Northern District of Ohio.  ECF No. 1.  In the Complaint, Villanueva asserts ten causes of action against all of Defendants–York, Marsh, and Marcus Barcroft ("Barcroft").  ECF No. 1 at 4-10.  Villanueva alleges breach of contract (Count One; ECF No. 1 at 4-5), breach of a fiduciary duty (Count Two; ECF No. 1 at 5), fraud (Count Three; ECF No. 1 at 6), unjust enrichment (Count Four; ECF No. 1 at 6), conversion (Count Five; ECF No. 1 at 7), promissory estoppel (Count Six; ECF No. 1 at 7), violations of the Ohio Securities Act (Count Seven; ECF No 1 at 8), violations of the Ohio Consumer Sales Protection Act (Count Eight; ECF No. 1 at 8-9), civil violations of the U.S. RICO Act (Count Nine; ECF No. 1 at 9-10), and punitive damages (Count Ten; ECF No. 1 at 10).  ECF No. 1 at 4-10.

Since filing of the complaint, both York and Villanueva have moved the Court to take various actions.  On October 15, 2010, York filed a Motion to Dismiss for Lack of Personal Jurisdiction, Improper Venue, or, Alternatively, to Transfer Venue, and to Dismiss for Failure to State a Claim.  ECF No. 21.  On November 11, 2010, Villanueva filed a Motion for Partial Summary Judgment.  ECF No. 35.  In response to Villanueva's motion, on December 13, 2010, York filed a Rule 56(f) Motion to Withhold Ruling on Villanueva's Motion for Partial Summary Judgment.  ECF No. 42.  On May 12, 2011, Villanueva filed a Motion for Default Judgment against Marsh, who has failed to plead or otherwise defend himself in the instant lawsuit.  ECF No. 56.

(1:10CV01488)

### III. **Background**

This action arises out of an alleged investment scheme sold to Villanueva in early 2010. Villanueva alleges that in January of 2010 Barcroft approached her with an investment opportunity that would guarantee high yield returns. ECF No. 33 at 1.

The opportunity involved participating in an investment program, entitled "500k CMO Program." ECF No. 1 at 3. As a condition of entry, the participant was required to invest a minimum of $500,000. These funds would then be wired to an escrow account–held by York, the Escrow Agent–to be used to purchase an approved collateral mortgage obligation ("CMO") for trade. ECF Nos. 1 at 3; 32 at 20-21; 1-2 at 2. In consideration for the program participant's substantial investment, the participant would be contractually guaranteed a high return evidenced by an "Escrow Agreement" between the participant–who is identified in the agreement as the "Depositor"–and the Escrow Agent, York. ECF Nos. 1 at 3; 1-2 at 2. The Escrow Agreement provided that if trading on the participant's CMO did not commence within a specified period, the participant would receive a payment equal to her principal investment amount plus an additional 10%. ECF Nos. 1 at 3; 1-2 at 2 (Non Performance Clause). If trading were, however, to commence pursuant to the terms of the Escrow Agreement, the participant would be entitled to 6 monthly payments totaling between $1,000,000 and $3,000,000. ECF Nos. 1 at 3; 1-2 at 2.

After becoming knowledgeable of the program, Villanueva told Barcroft that she had only $250,000 to invest and was, therefore, unable to meet the $500,000 minimum deposit amount required to participate in the 500k CMO Program. ECF No. 32 at 18. Barcroft responded by offering Villanueva the opportunity to invest in connection with him. Villanueva agreed. ECF

3

(1:10CV01488)

Nos. 1 at 3 and 32 at 18.  Villanueva and Barcroft agreed that each would be individually responsible for contributing $250,000 to meet the minimum deposit amount.  Their agreement did not involve Villanueva contracting directly with York as a Depositor, under the terms of the Escrow Agreement, as originally dictated.[1]  Rather, Villanueva and Barcroft consented to forming a separate contract–the "Profit Agreement"–by and between themselves.  ECF Nos. 1 at 3 and 32 at 18.

According to Villanueva, the Profit Agreement ECF Nos. 1-1 at 2-3; 33 at 15-16 provided that, in consideration for Villanueva wiring $250,000 to York, the Escrow Agent,–so that York could use the funds to purchase the CMO for trade,[2] Barcroft would assign his rights under an Escrow Agreement that was entered into by and between Barcroft and York.  ECF Nos. 1 at 4; 1-1 at 2-3.  This understanding is not entirely clear from the text of the Profit Agreement, which like other documents material to this case, are not models of clarity.  The Profit Agreement does appear, however, to clearly show that Villanueva is entitled to receive 50% of the net profits after payment of an escrow fee of 30% or 50% of the principal $500,000 plus 10% fee, if trading did not commence.  ECF Nos. 1 at 4; 1-1 at 2-3.

---

[1] In *Concheck v. Barcroft,* No. 2:10-cv-656 (S.D. Ohio filed on July 22, 2010), plaintiff Joseph Concheck presents similar allegations against the same Defendants.  ECF Nos. 25-1 and 25-2.  Unlike Villanueva, Concheck directly entered into the Escrow Agreement with York in consideration for a $500,000 investment.  ECF No. 25-2 at 42-45.

[2] Presumably on Barcroft's behalf to match the $250,000 Barcroft had allegedly already invested.

4

(1:10CV01488)

The Profit Agreement repeatedly references the term Escrow Agent, a term defined in an Escrow Agreement entered into by Barcroft as "Depositor" and York's business, M Y Investments. ECF Nos. 1 at 4; 1-1 at 2-3; 1-2 at 2-3. Additionally, both agreements contain the following identical sentence in nearly identical "Non Performance" [sic] clauses:

> Any and all legal issues will be through the State of Michigan and will follow the laws and guidelines of the State of Michigan.

ECF Nos. 1-1 at 2-3 and 1-2 at 2-3.

After Villanueva wired $250,000 to York's account, pursuant to the Profit Agreement, she was informed by Barcroft that trading had, in fact, commenced. ECF No. 32 at 25. Villanueva did not receive, however, any of the monies–including her initial investment–that were contractually guaranteed. Villanueva initiated the instant action to obtain relief. ECF No. 1 at 4.

Since filing this lawsuit, both York and Barcroft have blamed Defendant Marsh for Villanueva's predicament. ECF Nos. 32 at 42; 43 at 7-8; 36 at 5-6. Barcroft has attempted to distance himself from his role in the scheme, by stating that he was only an intermediary, working under the direction and instruction of Marsh to recruit investors to participate in the program.[3] ECF No. 32 at 51-52. Barcroft asserts also that he never received any payment for his services. ECF No. 32 at 43. Additionally, in regards to his agreement with Villanueva, Barcroft states that none of his personal funds were actually used to invest in the 500k CMO Program.

---

[3] Barcroft states ". . . everything I did was under Robert Marsh's instructions." ECF No. 32 at 42.

5

(1:10CV01488)

Rather, he alleges that unbeknownst to Villanueva, Marsh invested the remaining minimum

deposit amount–$250,000–on Barcroft's behalf. ECF No. 32 at 48.

York acknowledges that Villanueva's funds were wired into his account and that he took

some for his own use. (ECF No. 25-2 at 16-17). He nevertheless contends that he believed the

money belonged to Marsh and was proceeds from a legitimate business transaction (ECF Nos.

25-2 at 12-13; 36 at 5). Moreover, York claims that his signature was forged on the Escrow

Agreement by Marsh. ECF Nos. 21-1 at 2; 36 at 5-6. He also states that he was not aware of

either the Escrow Agreement or the Profit Agreement until April 19, 2010, several months after

Villanueva had wired her funds into his account. ECF Nos. 36 at 6-7; 21-1 at 2.

### IV. Rule 12(b)(2) Standard of Review

Under Rule 12(b)(2) of the Federal Rules of Civil Procedure, a defendant may move a

court to dismiss a case for lack of personal jurisdiction. The plaintiff bears the burden of

demonstrating that personal jurisdiction exists. *Air Prods. and Controls, Inc. v. Safetech Intern.,*

*Inc.*, 503 F.3d 544, 549 (6th Cir. 2007). When the defendant files a properly supported motion to

dismiss, "the plaintiff may not stand on [its] pleadings but must, by affidavit or otherwise, set

forth specific facts showing that the court has jurisdiction." *Theunissen v. Matthews d/b/a*

*Matthews Lumber Transfer*, 935 F.2d 1454, 1458 (6th Cir. 1991) (citation omitted).

Nonetheless, when ruling on a motion to dismiss for lack of personal jurisdiction, a district court,

"without conducting an evidentiary hearing, . . . must consider the pleadings and affidavits in a

light most favorable to the plaintiff." *Dean v. Motel 6 Operating L.P.*, 134 F.3d 1269, 1272 (6th

Cir. 1998) (citations omitted). The plaintiff "need only make a prima facie showing of

6

(1:10CV01488)

jurisdiction," and the court "does not weigh the [defendant's] controverting assertions." *Id.*

Dismissal is proper where the plaintiff's factual allegations taken together fail to establish a

prima facie case for personal jurisdiction. *Compuserve, Inc. v. Patterson*, 89 F.3d 1257, 1262

(6th Cir. 1996).

### V. **Discussion**

York's motion to dismiss presents two arguments. First, York contends that the Court

lacks personal jurisdiction because neither he nor his investment company has sufficient

minimum contacts with Ohio to meet constitutional due process requirements. He highlights that

he never signed the Escrow Agreement nor did he take any action under the contract. ECF Nos.

21 at 3, 5-13; 36 at 2-11. Additionally, York argues that the action should be dismissed pursuant

to "12(b)"[4] of the Federal Rule of Civil Procedure as both the Escrow Agreement and the Profit

Agreement contain a forum selection clause which requires the action to be litigated in Michigan.

ECF Nos. 21 at 8-9; 36 at 11-12. He, therefore, moves the Court to dismiss or, alternatively,

transfer the case to the United States District Court for the Eastern District of Michigan.[5] ECF

Nos. 21 at 9; 36 at 8-9.

---

[4] *See Security Watch, Inc. v. Sentinel Systems, Inc.*, 176 F.3d 369, 374-76 (6th Cir. 1999) (affirming the district court's dismissal pursuant to an unspecified subsection of Federal Rule of Civil Procedure 12(b) to enforce a forum-selection clause).

[5], Additionally, York moves the Court to dismiss the Counts One through Nine pursuant to 12(b)(6) for several reasons including that he was neither signatory to the Escrow Agreement nor the Profit Agreement. ECF Nos. 21 at 14-22; 36 at 10-14. Because the Court finds that the preliminary issue of the Forum Selection Clause divests this Court of jurisdiction, the Court declines to address these additional arguments.

7

(1:10CV01488)

In opposition, Villanueva argues that the Court has personal jurisdiction over the moving

Defendants. Villanueva upbraids York's first argument by averring that York's involvement in

the fraudulent scheme as evidenced by his acceptance of her wired money, alone, suffices to meet

Ohio's Long Arm Statute's minimum contacts requirement. ECF No. 33 at 2-6.

Moreover, Villanueva rejects York's reliance upon the "Non Performance Clause" to

dismiss the case.[6] She argues that the language York relies upon does not evidence the existence

of a forum selection clause. ECF No. 33 at 11-12. "[A]t best, the sentence is ambiguous, and

thus would be interpreted as a choice of law provision or entirely unenforceable against the

defendant drafters." ECF No. 33 at 13. Villanueva further contends that even if the sentence

were interpreted as a forum selection clause, its existence would not justify a transfer of venue,

ECF No. 33 at 14-15, and York would be estopped from invoking the forum selection clause

because this defense is inconsistent with his previous position that the contracts, containing the

clause, are unenforceable against him. ECF No. 33 at 12.

The Sixth Circuit has noted that "the use of a forum selection clause is one way in which

contracting parties may agree in advance to submit to the jurisdiction of a particular court."

_Preferred Capital, Inc. v. Associate in Urology_, 453 F.3d 718, 721 (6th Cir. 2006). Because the

Supreme Court "has held that such clauses 'should control absent a strong showing that [they]

---

[6] **Non Performance Clause**; Escrow Agent unconditionally and absolutely promises that
if trading has not commenced within 60 days from the date of the deposit of the $250,000USD
from the JV Partner providing for distributions, Escrow Agent shall be personally LIABLE for
the FULL return of the $250,000USD plus an additional $25,000 USD for a total of $275,000
USD to the JV Partner. Any and all legal issues will be through the State of Michigan and will
follow the laws and guidelines of the State of Michigan.

8

(1:10CV01488)

should be set aside,'"[7] the resolution of York's motion to dismiss hinges upon (1) whether there

is a valid and enforceable forum selection clause governing the location of the court adjudicating

the dispute and (2) whether the clause is applicable to the matter at hand.

### A. Is the Forum Selection Clause Valid and Enforceable?

> **1. The ordinary and plain meaning of the language indicates that the sentence at issue contains both a forum selection clause–indicating the State of Michigan as the forum–and a choice of law provision–requiring Michigan State law to govern the dispute.**

As a preliminary matter, the Court disagrees with Villanueva's contention that the last

sentence in the Non Performance Clause is ambiguous and should be deemed unenforceable.

ECF No. 33 at 11-12. Whether contractual terms are ambiguous is a question of law for the

court. See *Tennessee Consol. Coal Co. v. United Mine Wkrs. of Am.*, 416 F.2d 1192, 1198 (6th

Cir. 1969). "If a contract is clear and unambiguous . . . there is no issue of fact to be

determined." *Royal Ins. Co. of Am. v. Orient Overseas Container Line Ltd.*, 525 F.3d 409, 421

(6th Cir. 2008) (quoting *Lincoln Elec. Co. v. St. Paul Fire & Marine Ins. Co.*, 210 F.3d 672, 684

(6th Cir. 2000)). "Ambiguity exists 'if the language is susceptible to two or more reasonable

interpretations. . . . In making such a determination, a district court is counseled to read the

contract as a whole, and to give the contract language its ordinary and natural meaning.'" *Royal*

---

[7] *See Wong v. Party Gaming, Ltd.*, 589 F.3d 821, 826 (6th Cir. 2009) (citing *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 587, 591 (1991)). "A valid forum selection clause should receive neither dispositive consideration . . . nor no consideration but rather should be a significant factor that figures centrally in the district court's calculus." *See Concheck*, S. Dist. OH., No. 2:10cv656, at 10.

(1:10CV01488)

*Ins. Co. of Am.*, 525 F.3d 421 (quoting *United States v. Donovan*, 348 F.3d 509, 512 (6th Cir. 2003)); *see also Parrett v. Am. Ship Bldg. Co.*, 990 F.2d 854, 858 (6th Cir. 1993)

In the instant case, when the last sentence of the Non Performance Clause is read as a whole and its language given its ordinary and natural meaning, that sentence unambiguously contains both a forum selection clause and a choice of law provision.

### a. The Last Sentence Contains Two Distinct Provisions

Villanueva argues that the sentence at best can be construed as a choice of law provision as it only speaks to "legal issues" and "laws," which relate to the determination of matters *within* the lawsuit as opposed to the actual forum of the lawsuit itself. ECF No. 33 at 12-13. The Court finds, however, that Villanueva fails to appreciate the structure of the sentence, which indicates that there are two distinct provisions that are substantively different. Again, the sentence at issue states:

> Any and all legal issues will be through the State of Michigan and will follow the laws and guidelines of the State of Michigan.

ECF Nos. 1-1 at 2-3 and 1-2 at 2-3. The sentence contains only one subject– "any and all legal issues." Additionally, the word "and"–a conjunction, commonly used to connect two clauses or phrases[8]–is placed in between two future tense verbs-"will be" and "will follow". This demonstrates that the sentence contains two separate provisions:

(1)   Any and all legal issues "will be through the State of Michigan"
(2)   Any and all legal issues "will follow the laws and guidelines of the State of Michigan".

---

[8] *See* Webster's New International Dictionary, Unabridged 80 (1993).

(1:10CV01488)

Additionally, construing the sentence as a whole and avoiding an interpretation that would render one of the provisions meaningless requires the Court to find that each section has a distinct meaning. *See Royal Ins. Co. of Am.*, 525 F.3d 421; *see also PCL Const. Services, Inc. v. U.S.*, 47 Fed.Cl. 745, 784 (Fed. Cl. 2000) ("When interpreting the language of a contract, a court must give a reasonable meaning to all parts of the contract and not render portions of the contract meaningless.") (citing *Fortec Constructors v. United States*, 760 F.2d 1288, 1292 (Fed.Cir.1985)).

### b. The First Provision Is a Forum Selection Clause; Second P and Is a Choice of Law Provision

Contrary to Villanueva's assertion, the first part ir provision of the sentence refers to the appropriate forum for litigation as evidenced by the naming of an actual location–"State of Michigan" which is preceded by the preposition–"through."[9] The word "through" in this context is often used to describe movement or passage within a place or an area of land.[10] The ordinary

---

[9] In *Concheck*, the Court found that no forum selection clause existed. The undersigned evaluated the same language and reached a different conclusion. The different conclusions appear to hinge upon the relevance of the phrase "through the State of Michigan." The *Concheck* Court found that because the phrase "lacks any mention of specific courts or types of courts in Michigan, and does not, when read literally, mandate that resolution of [legal] disputes occur geographically within Michigan . . . this sentence cannot be interpreted as a forum selection clause, but instead [the Court concedes] is best interpreted as indicating that any legal questions will be decided by Michigan law." *Concheck v. Barcroft*, S. Dist. Ohio, No. 2:10cv656, ECF No. 62 at 9. BLACK'S LAW DICTIONARY, Sixth Ed.(1990) provides "[t]hrough is [a] function word capable of several meanings depending on its use; it may indicate passage from one side to another, means of communication, or movement from point to point within a broad expanse or area." To minimize the importance of the term "through" is to change the meaning of the entire sentence and, by that, the Non Performance Clause.

[10] *See* http://www.learnersdictionary.com/search/through%5B1%5D (last visited September 30, 2011). As indicated in the note above, Black's Sixth Ed. (1990) defines

11

(1:10CV01488)

and plain meaning of the first part of the sentence is: "[a]ny and all legal issues will [take place in] the State of Michigan." ECF Nos. 1-1 at 2 and 1-2 at 2. If the first part of the sentence merely designated the choice of law to be applied, it would render the second part of that sentence redundant, as both parts would do nothing more than announce the law to be applied. *See Statesman II Apartments, Inc. v. United States*, 66 Fed. Cl. 608, 616 (2005) ("Any contract or agreement must be construed as a whole, giving effect to all parts and every word in it if possible.")

The second part or provision is a choice of law provision as it unequivocally states the applicable law to govern the dispute. Similar to the first provision, this part indicates a physical location–"State of Michigan." However, unlike the former provision, the physical location is modified by the phrase "laws and guidelines of" and the provision further instructs that "the laws and guidelines of" are to be "follow[ed]." The language, taken in the totality, is harmonious with a choice of law provision.

Moreover, the Court's interpretation that the sentence contains both a forum selection clause and a choice of law provision is consistent with the general anatomy of foreign selection

---

"through" as follows:

> "By means of, in consequence of, by reason of; in, within, over; from end to end as from one side to the other. By the intermediary of; in the name or as an agent of . . .

> "Through" is function word capable of several meanings depending on its use; it may indicate passage from one side to another, means of communication or movement from point to point within a broad expanse in area." (Citations omitted)

12

(1:10CV01488)

clauses as they "are often . . . designed to specify not only the site, but also the applicable law, for

a given dispute." *See Liles v. Ginn-La West End, Inc.*, 631 F.3d 1242, 1247 (11th Cir. 2011).

### 2. The Forum Selection Clause is Enforceable

Having determined that both the Profit Agreement contains a forum selection clause, the

Court's next inquiry involves determining whether said clause is enforceable. When evaluating

the enforceability of a forum selection clause, the Sixth Circuit has instructed the Court to look to

the following three factors:

> (1) whether the clause was obtained by fraud, duress, or other unconscionable
> means; (2) whether the designated forum would ineffectively or unfairly handle
> the suit; and (3) whether the designated forum would be so seriously inconvenient
> such that requiring the plaintiff to bring suit there would be unjust.

*See Wong v. Party Gaming, Ltd.*, 589 F.3d 821, 828 (6th Cir. 2009). Additionally, "[t]he party

opposing the forum selection clause bears the burden of showing that the clause should not be

enforced". *Id.*

### a. The Forum Selection Clause Was Not, by Itself, Obtained by Fraud, Duress or Other Unconscionable Means

Under the first factor, the party opposing the clause must show fraud in the inclusion of

the clause itself. *Wong, 589 F.3d at 828.* In spite of Villanueva's allegation that she was a

victim of a fraudulent scheme, such a claim is insufficient to satisfy the first prong of the test.

The Sixth Circuit has stated that "when a contract contains a forum selection clause, a distinction

must be made between fraud in the inducement of the agreement [as to the Forum Selection

Clause] and allegations of fraud concerning the contract as a whole." *Arnold v. Arnold*

*Corp.-Printed Communications For Bus.*, 920 F.2d 1269, 1277-78 (6th Cir. 1990) (citing *Prima*

13

(1:10CV01488)

*Paint Corp. v. Flood & Conklin Mfg.* Co., 388 U.S. 395, 403-04, 87 S. Ct. 1801 (1967)). As Villanueva's fraud claim reflects upon the agreement as a whole, and not to the specific Forum Selection Clause, the Court finds that Villanueva has not shown the clause to be unenforceable under the first factor.

### b. The Designated Forum Would Not Ineffectively or Unfairly Handle The Suit

Under the second factor, plaintiff must show that the identified forum would ineffectively or unfairly handle the suit. *See Wong*, 589 F.3d at 829. The record before the Court, however, lacks any indication that the designated forum–Michigan–would be unable to fairly litigate this case. Accordingly, in the absence of evidence indicating otherwise, the Court finds that clause remains enforceable pursuant to the second prong.

### c. Enforcement of the Forum Selection Clause Would Not Be Unreasonable or Unjust

Under this step of the analysis, courts are to determine whether the chosen forum is so inconvenient such that enforcement of the clause would be unjust or unreasonable. *See Wong*, 589 F.3d at 829 (citing *Preferred Capital, Inc. v. Assocs. of Urology*, 453 F.3d 718, 722-23 (6th Cir. 2006)). "This finding must be based on more than mere inconvenience of the party seeking to avoid the clause." *See Wong*, 589 F.3d at 829.

Villanueva's argument against the enforceability of the clause under the third prong, however, hinges upon a showing of mere inconvenience, rather than the requisite showing that enforcement of the provision would be unreasonable or constitute an impediment to justice. *Id.* For instance, in support of her argument that the Court should not grant York's alternative

14

(1:10CV01488)

motion to transfer to Michigan, Villanueva offers the fact that she and several witnesses reside in

Ohio.  ECF No. 33 at 14-15.  Villanueva's additional proffered reasons to deny the transfer

include the allegation that none of the Defendants would be inconvenienced as Michigan and

Ohio are adjoining states, and that the Court's ruling in favor of the moving Defendants will

cause delay and duplication.  ECF No. 33 at 15.  While the listed reasons undoubtedly support

Villanueva's position that removing the instant case from Ohio may prove to be less convenient,

it cannot be said that enforcement of the clause would be unjust or unreasonable.  *Id.*

As Villanueva has not made an adequate showing under any of the aforementioned

factors, the Court deems the forum selection clause valid and enforceable.  *Id.* at 828-30.

### B.  Is the Forum Selection Clause Applicable?

Although the forum selection clause is enforceable, the Court must also determine

whether the clause is applicable to the matter at hand.  Specifically, the Court must inquire as to

(1) which of Villanueva's claims are covered under the clause and (2) which parties are either

bound by the clause or capable of invoking its protection.

### 1.  The Forum Selection Clause Applies to All of Villanueva's Claim

With respect to the first issue, the Court finds that the forum selection clause includes all

of Villanueva's claims.  Foremost, the language of the clause is broad as it states "any and all

legal issues will be through the State of Michigan."  ECF Nos. 1-1 at 2-3 and 1-2 at 2-3.

Secondly, each of Villanueva's causes of action arises out of the Profit Agreement.  This is best

evidenced by the Complaint, wherein each count incorporates by reference the allegation that

15

(1:10CV01488)

Villanueva entered into a Profit Agreement with the Defendants[11] and references the terms and

conditions of the Profit Agreement. ECF No. 1. *See Liles*, 631 F.3d at 1255-56 (11th Cir. 2011)

(holding that plaintiffs' claims were all governed by the forum selection clause partially on the

grounds that each count in the complaint referenced the agreement).

### 2. The Forum Selection Clause Applies to Both Villanueva and York

Concerning the second issue, the Court's inquiry is complex. Although this is a contract

dispute, not all parties were a signatory to the same agreement. The record reflects that

Villanueva was a signatory party to the Profit Agreement. York was not a signatory to the Profit

Agreement signed by Villanueva, which nearly mirrors the Escrow Agreement (entered into by

York and Barcroft) that, if York's allegation is to be given even minimal weight, contains a

forgery of his signature.[12] ECF Nos. 1-1 and 1-2. In light of these circumstances, the Court

resolves two inquiries: (a) whether Villanueva is bound by the forum selection clause contained

in the Profit Agreement and/or Escrow Agreement and (b) whether York–an alleged

non-signatory to the same agreements–is entitled to invoke that clause.[13]

### a. Villanueva Is Bound by the Forum Selection Clause

While the Sixth Circuit has determine that a non-signatory to a contract may be bound by

"a forum selection clause in that contract if the non-signatory is so sufficiently 'closely related' to

the dispute that it is foreseeable that the party will be bound." *See Hitachi Med. Sys. Am. v. St.*

---

[11] Either directly or *via* assignment.

[12] York claims Marsh forged his signature onto the Escrow Agreement.

[13] Because the Profit and Escrow Agreements are closely related, as discussed below, and the forum selection clauses in each are identical, the Court's analysis is interchangeable.

16

(1:10CV01488)

*Louis Gynecology & Oncology, LLC*, 2011 U.S. Dist. Lexis 17022, *24-25 (N.D. Ohio 2011)

(citing *Baker v. LeBoeuf, Lamb, Leiby & Macrae*, 105 F.3d 1102, 1105-06 (6th Cir. 1997)). And,

while the Sixth Circuit has yet to explicitly interpret the term "closely related," at least one

district court in this Circuit has held that an assignee meets this definition and is, therefore,

bound by a forum selection clause contained in an underlying contract, to which the assignee is

not a signatory. *See Regions Bank v. Wyndham Hotel Mgmt., Inc.*, 2010 U.S. Dist. Lexis 23371,

*19-20 (M.D. Tenn. 2010). This occurs when the assignment agreement, to which the assignee

party is a signatory, incorporates by reference the underlying contract and the underlying contract

is attached to the assignment agreement. *See Id.* (citing *Exch. Mut. Ins. Co. v. Haskell Co.*, 742

F.2d 274, 276 (6th Cir. 1984) (finding that a non-signatory may become bound by a contract

when that contract is "specifically incorporated by reference" by another contract to which the

party is a signatory)).

It is clear that the Profit Agreement and Escrow Agreement are "closely related." The

facts disclosed at this early stage of litigation confirms that close relationship. There is also no

dispute that York is the Escrow Agent referred to in those related documents.

It cannot be ignored, however, that the inartfully worded Profit Agreement fails to

explicitly incorporate the Escrow Agreement or assign the rights of Barcroft to Villanueva,

17

(1:10CV01488)

despite Villanueva's assertions to the contrary.[14]  The Profit Agreement does, however, indicate that rights are assignable.

It is also undeniable that the The Profit Agreement repeatedly references the Escrow Agreement.  Although the record does not reflect that the Escrow Agreement was physically attached to the Profit Agreement, reviewing the facts in a light most favorable to Villanueva, she was obviously aware of the existence and contents of the Escrow Agreement prior to entering into the Profit Agreement with Villanueva.  She also received a copy of the Escrow Agreement and acknowledged its contents by initialing it.  ECF No. 32 at 21-22.  Additionally, the Profit Agreement  signed by Villanueva contains the very same forum selection clause that is present in the Escrow Agreement.  Therefore, it cannot be said that binding Villanueva to the forum selection clause is unfair, as its language  and its effect on Villanueva were certainly foreseeable.  *See Baker,* 105 F.3d at 1106.

---

[14]  In the instant case, York disputes Villanueva's assertion that the Profit Agreement constituted an assignment (to Villanueva) of Barcroft's rights under the Escrow Agreement.  ECF No. 36 at 10-11.  York argues that Villanueva has failed to show (1) that Barcroft made an oral or written offer to assign his rights under the Escrow Agreement and (2) that consideration was provided for the Profit Agreement.  ECF No. 36 at 10-11.  Even if the Court were to find that the Profit Agreement did not constitute an assignment agreement, as York contends, Villanueva would still be bound by the forum selection clause contained in the Profit Agreement as a signatory. York would be entitled to enforce the forum selection clause in the Profit Agreement under the theory of equitable estoppel, which is discussed below. And, for the purpose of this exercise, viewing the facts in the light most favorable to Villanueva, the Court need not credit York's claim that his signature was forged onto the related Escrow Agreement which contains the identical forum selection clause.

18

(1:10CV01488)

### b. York May Invoke the Forum Selection Clause

The Court finds that York is entitled to invoke the forum selection clause contained in the Escrow Agreement, despite his allegations that he did not sign the Escrow Agreement. In *Liles v. Ginn-LA West End, Ltd.*, 631 F.3d 1242, 1256-57 (11th Cir. 2011), the Eleventh Circuit Court of Appeals held that a non-signatory to a contract could invoke a forum selection clause contained therein against a signatory to a contract based upon the theory of equitable estoppel. In arriving at their conclusion, the Court primarily relied upon its previous decision–in *MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir. 1999)–wherein the Court had recognized that the equitable estoppel doctrine permits a non-signatory to invoke an arbitration agreement. The Eleventh Circuit's decision to extend the holding of *MS Dealer Serv. Corp.*, and transfer the theory of equitable estoppel doctrine to the context of forum selection clauses was based upon that Circuit's acknowledgment that forum selection clauses are substantially similar to arbitration agreements. *See Liles*, 631 F.3d at 1256.

While the Sixth Circuit has yet to decide whether the equitable estoppel doctrine permits a non-signatory to invoke a forum selection clause, the Eleventh Circuit Court of Appeal's ruling is consistent with the holdings and precedent established in the Sixth Circuit. Foremost, permitting a non-signatory to invoke a contractual provision, albeit an arbitration clause, has been recognized by the Sixth Circuit. In a case concerning the applicability of an arbitration clause, the Sixth Circuit Court of Appeals acknowledged that a non-signatory party could be entitled to invoke the provision. *See Javitch v. First Union Securities, Inc.*, 315 F.3d 619, 628-29 (6th Cir. 2003) (deciding whether the district court erred in concluding that the theory of equitable estoppel was inapplicable to a party) (citing *Thomson-CSF v. Am. Arbitration Ass'n*, 64

19

(1:10CV01488)
F.3d 773, 778-79 (2d Cir. 1995)).  And, there is at least one district court within this Circuit that

has held that a non-signatory party to a contract could compel a signatory to abide by the

arbitration clause contained therein.  *See Moro Aircraft Leasing, Inc. v. Keith*, 2011 U.S. Dist.

Lexis 61869, *20-24 (N.D. Ohio 2011).

   Additionally, as in *Liles*, the Sixth Circuit has recognized that forum selection clauses and

arbitration provisions are substantially similar.  *See Moses v. Business Card Express, Inc.*, 929

F.2d 1131, 1138 (6th Cir. Mich. 1991) (stating that arbitration clauses are a particular type of

forum selection clauses); *Liles*, 631 F.3d at 1256.  *See also Moses*, 929 F.2d at 1138; *Liles*, 631

F.3d at 1256.

   Relying upon the aforementioned case law, the Court finds that the theory of equitable

estoppel is indeed applicable in this context.  The Court, therefore, adopts the test articulated in

*Liles* which provides:

> An equitable estoppel theory allows a nonsignatory [to invoke a forum selection
> clause] in two different circumstances. First, equitable estoppel applies when the
> signatory to a written agreement containing [a forum selection] clause 'must rely
> on the terms of the written agreement in asserting [its] claims' against the
> nonsignatory. When each of a signatory's claims against a nonsignatory "makes
> reference to" or "presumes the existence of" the written agreement, the signatory's
> claims "arise[ ] out of and relate[] directly to the [written] agreement," and
> [allowing the nonsignatory to invoke the forum selection clause] is appropriate.
> Second, "application of equitable estoppel is warranted ... when the signatory [to
> the contract containing the [forum selection] clause] raises allegations of ...
> substantially interdependent and concerted misconduct by both the nonsignatory
> and one or more of the signatories to the contract."

*Id.* (quoting  *MS Dealer Serv. Corp.*, 177 F.3d at 947).

   Both circumstances giving rise to equitable estoppel exist here.  First, all of Villanueva's

claims arise out of the Escrow Agreement containing the forum selection clause.  Secondly,

20

(1:10CV01488)

Villanueva's allegations against York are primarily premised upon the theory of agency and that

all of the Defendants–including Barcroft, a signatory to both the Escrow Agreement and Profit

Agreement–acted in concert to defraud Villanueva.  ECF Nos. 1; 33 at 8-11; 35 at 4 and 8-9.

Accordingly, York is entitled to invoke the forum selection clause contained in the

Escrow Agreement and, by extension, as a closely related document, the identical clause in the

Profit Agreement.

### C.  Is York Estopped from Invoking the Forum Selection Clause?

Lastly, the Court deems it appropriate to briefly address Villanueva's remaining argument

that York is estopped from invoking the forum selection clause because this defense is

inconsistent with his alternative argument that the overall contract is unenforceable.  The Court

disagrees with Villanueva's assessment that York's presentation of alternative arguments are

tantamount to York "improperly trying to have [his] cake and eat it too" (ECF No. 33 at 12).

As a preliminary matter, the Court notes that Rule 8 of the Federal Rules of Civil

Procedure permits defendants to plead inconsistent positions.  *See* Fed. R. Civ. P. 8(d)(3).

Additionally, Villanueva's view of estoppel is in error.  The theory that she relies upon in

making her argument is judicial estoppel, not to be confused with equitable estoppel described

above.[15]  ECF No. 33 at 12 (citing *Pro Edge L.P. v. Gue*, 451 F.Supp.2d 1026, 1036 (N.D. Iowa

2006)).

---

[15] *See United States v. Owens*, 54 F.3d 271, 275 (6th Cir. 1995) (stating that "this Circuit, however, has distinguished judicial estoppel from equitable estoppel").

(1:10CV01488)

With respect to the theory of judicial estoppel, the Sixth Circuit has held that there is no set formula for assessing when judicial estoppel should apply, and that Courts should consider a variety of factors including whether " (1) a party's later position is clearly inconsistent with its earlier position; (2) the party has succeeded in persuading a court to accept that party's earlier position; and (3) the party advancing an inconsistent position would gain an unfair advantage if allowed to proceed with the argument." *See United States v. Hammon*, 277 Fed. Appx. 560, 566 (6th Cir. 2008) (citing *In re Commonwealth Institutional Sec.*, 394 F.3d 401, 406 (6th Cir. 2005)). The Sixth Circuit, however, has limited the doctrine to apply only to those instances "where a party asserts a position in litigation that is *adopted* by the court, gains an advantage through that assertion, and then attempts to assert a clearly opposite position in a later proceeding." *Hammon*, 277 Fed. Appx. at 566 (emphasis added). In reviewing this matter for procedural correctness, the Court has not adopted York's positions, the doctrine of judicial estoppel is, therefore, inapplicable.

Additionally and perhaps more directly to the point, the Court does not find York's argument–asserting that Villanueva should be bound by the forum selection clause–inconsistent with his position that he did not sign the contract. As discussed above, the theory of equitable estoppel permits York to maintain his averment that he is not a signatory to the contract while simultaneously allowing him to invoke the provisions contained therein. *See Liles*, 631 F.3d at 1256.

22

(1:10CV01488)

## VI.  **Conclusion**

Having found the forum selection clause enforceable and applicable to this lawsuit, the Court dismisses the claims against York without prejudice.  Villanueva may refile these claims in the appropriate Michigan Court.  As to the claims asserted against the remaining Defendants, the Court dismisses all claims asserted against them as well, in light of the Court's finding regarding the enforceability and applicability of the forum selection clause.

Accordingly,  for all of the reasons discussed above, the Motion to Dismiss, or, in the Alternative, to Transfer filed by York is granted. The pending motions are denied as moot and the case in its entirety is dismissed from the Court's docket.

IT IS SO ORDERED.

September 30, 2011
Date

Benita Y. Pearson
United States District Judge

23